Case number 17-1243. State of North Carolina petitioner v. Federal Energy Regulatory Commission. Mr. Doggett for the petitioner, Mr. Kennedy for the respondent, and Mr. McBride for the intervener. Thank you. Mr. Doggett. Thank you. May it please the Court. My name is Jim Doggett, and I represent the State of North Carolina. Good morning. Good morning. I'd like to reserve three minutes of my time for rebuttal, if I may. The license granted to Alcoa to generate power from North Carolina's second-largest river system, which has now been transferred to Cube, should be vacated for three reasons. First, Alcoa chilled the emergence of competition for its license by stating that its Baden Works smelting plant would only have its operations curtailed temporarily. As a result, under FERC's rules, licensing should be reopened. Second, FERC's decision not to use its actual powers to reopen licensing was not based on reasoned decision-making. Third, FERC also failed to adequately consider North Carolina's proposal that the Atkin project be placed under public ownership. With respect to your first argument, is that based on the premise that at the time it filed its application, Alcoa knew that it was going to permanently close the Baden Works? No, Your Honor. That's not a premise that underlies our argument. Because you do at one point argue that in your brief, that they knew that, almost like that there's a kind of like fraudulent concealment theory. But you're saying that you don't have to establish that. It's just the fact that they represented that it was temporary and then facts changed and it became permanent later, that that's sufficient to require FERC to have found their application to be incurably deficient? Yes, Your Honor. I think that's correct. Even assuming that they did not know it was going to be permanent, there was no representation as to how long temporary meant, was there? They didn't say it's temporary. We're going to be back handling the aluminum in three years or five years or two years. There was no representation as to the meaning of the temporary period, was there? Well, Judge Cantell, I think they did very clearly say that the shutdown, that the curtailment, first of all, the word curtailment implies that it's something of limitation of activity. Second of all, they said that it would be temporary. Getting back to my question, was there any representation as to how long the curtailment or temporary shutdown was going to be? No, Your Honor. So far as North Carolina knew or FERC knew when the application was filed, temporary could have meant 10 years. That's correct. It could have been much less. Is there any real material misrepresentation, whether intentional or unintentional here? Is there any materiality to the difference between an unspecified temporary period and a permanent period? Yes, Judge Cantell, I think it is material. In the state of North Carolina, when Alcoa curtailed operations at the Baden Works, there was a real hope that the jobs would come back. And in the subsequent filings that Alcoa made to FERC in the years after 2002, there was no indication that they had decided to shutter the plant entirely. And so I think that was material. The plant had been closed for six years at the time the application was filed. Four years, I believe. It was curtailed in 2002, and then the application was filed in 2006. But a substantial length of time. Yes, that's correct, that it had been curtailed by four years. But from the perspective of someone who might be considering competing for a license to run a hydropower facility, it takes a good deal of time to prepare a license. When the plant was, before it was curtailed in 2002, how much of the power from the Yadkin project was used for activities at the plant? I'm not sure if that's in the record. I believe most of the power was. Before the shutdown occurred, 400 people were employed at the plant, and its smelters were operational. Because I didn't see that in the briefing. Maybe it's in the record somewhere, and I didn't see it, I don't think, in FERC's decision. I mean, because part of your argument is that this is material because how the power would be used is material, right? And so there was some sort of expectation at the time that the license application process was going that Alcoa would have an advantage because it was material how the power was going to be used, and there was at least some sort of expectation that a significant amount of the power would be used for the Batten Works. But at the time of the application, they represented that only about 2% of the power was going to be used for Batten Works, right? That's correct. About the 2% figure, I think the important thing to recognize is not that 2% is obviously a fairly small point, the amount of power that was being used by 2006, but that there was a hope that the amount of power that would eventually be used to operate Batten Works and provide jobs to North Carolinians would go up above 2%, much higher than it had been in the past. So your argument is that at the time that they filed their application, where they represented that 2% would be used for industrial use, their own industrial use, that gave them an inherent advantage over any other applicant that was just going to operate the facility and sell on the open market? I believe the 2% figure was the amount of power that they were using when they submitted their application in 2006, not in 2002. In 2006, yes. Correct. At the time, I guess my point is that the argument on the other side is that, look, even if it's correct to assume that Alcoa kind of had some sort of advantage because the power was going to be used for Batten Works, the representation was that only 2% of the power was going to be used for Batten Works. I mean, there's nothing in the record that shows that FERC, in granting the license, did so with the expectation that that plant was going to reopen and it was going to go from 2% to 50% or 75% or 100% or whatever it was prior to 2002, right? Is there anything like that in the record? Well, I think the materiality of the representations that were made before Alcoa filed its license and when it did file its license don't go to necessarily misleading FERC. It's rather that potential competitors saw that the shutdown was not permanent. Alcoa stated that the shutdown was temporary. The normal mean of temporary is that something is going to resume. But I guess in order to kind of gauge the merits of your argument, don't we have to, you know, it's easy to make that argument, but what evidence or what do we have to look to to infer that people were chilled by this representation that was made at the time of the license, which was that we're using 2% of the power for this plant? Well, I think you look at two things, Your Honor. First, Alcoa said that the shutdown would be temporary. And second, you can look at the reaction that happened in North Carolina after it really did finally become a political issue in the state and you saw that actually the jobs were not coming back. What you saw happen is that local people in Stanley County in North Carolina began to complain about this. Eventually that issue bubbled up to the state level and it became a major issue within state politics that Alcoa was seeking a license to run the Yadkin project and it had fired all the employees, didn't plan to hire them back. And that's once the actual facts came out, you can see the materiality because there was a volcanic eruption in North Carolina of anger about what had happened and it became a major political issue. If we were to hold that FERC was arbitrary and capricious or otherwise acted unlawfully in not letting you file a three-year late objection, if you would, to the application, what is it at this point in life you think is going to happen that's going to get better for the people of North Carolina? The project has gone on, the transfer to CUBE has been made. What is going to happen that's going to help your people out? If you believe me, I'd like to help the people of North Carolina. Of course. Go ahead. Well, first there would be an opportunity for—Alcoa was gone now. If CUBE wanted to compete again, CUBE's license application could be compared against competitors that might offer greater benefits to North Carolina. It would also have to be compared against the recapture request or license request application that North Carolina would file that would offer greater benefits to the state of North Carolina than what CUBE has provided. So it's your contention that the relief that we should grant is vacating the license, which vacates—essentially CUBE will have paid 200-some million dollars to take over this license for nothing, or they'll have the opportunity to recompete. But if they lose that competition, then they'll be left holding the bag, so to speak. Well, I don't know the terms of what CUBE's agreement with Alcoa were. It may be that CUBE is protected from this kind of eventuality. You would expect that a party represented by sophisticated counsel where a license had only been granted temporarily subject to a petition review would have protected themselves from that. But that $200 million figure, that half—a quarter of a billion dollars is a fair figure to think about here, because essentially what happened is that Alcoa delayed revealing that the shutdown of Baden Works would be permanent. As a result, it was able to sell its license on the market to the highest bidder for a quarter of a billion dollars. Do you think the Alcoa smelt plant will reopen at this point? At this point, no. Right, so we just can't unscramble the egg that you've been complaining about. Of course, that's definitely correct. The smelting plant is gone, but what's also gone is North Carolina's opportunity to compete for the license. And our position has been that North Carolina, if it had the opportunity to compete for the license, if its proposal that the Atkin Project be recaptured had been considered, we would have gotten— Did the presence of that word temporary or similar words in the application in any way hamper the ability of North Carolina to compete for the license? Had North Carolina chosen to do so? Well, I think it delayed the emergence of this as a political issue in North Carolina. I think if Alcoa had been forthright— So the harm here is the delaying of the political issue. That's correct. That's correct, I think. Instead of this issue emerging in 2002 when Alcoa curtailed operations of the bait and plant, it emerged in 2008 and 2009, at which point it was no longer possible for North Carolina to compete for the license. Again, I think things would have turned out very differently if Alcoa had shut down the plant. So you were deprived, not of an opportunity, but at most of an incentive to compete. You had the same opportunity to compete for the license without the word temporary in the application. You may not have had as great an incentive, but you had the opportunity. So you're two or three years late in making your objection, aren't you? Well, the state of North Carolina, I think, is differently situated than, say, a private competitor for a hydropower license. The purpose of the state of North Carolina is not to seek out hydropower opportunities. It's to respond to the desires and needs of its citizens. And once it became clear that these jobs weren't coming back, there was an uproar in North Carolina, and at that point it became a live political issue for the state, and the state wanted to make sure that this valuable asset would actually be used for public purposes, which is the entire purpose of the Federal Power Act. It's to make sure. What public purposes are left out there for it to be used for at this point? I'm sorry, Judge Hinton? What public purposes are left out there for it to be used for at this point? The jobs are gone. The smelting plant has been shuttered for years and years now. In fact, it's not even physically there anymore, is it? Well, I think the FPA envisions that there will be a vigorous competitive process when licenses come up for renewal to determine which are. I'm sure they do. Now, what is the public purpose that's left that you could be advancing with this license? If North Carolina comes in to compete, what is the public purpose? Assume that you're correct that you are relying on Alcoa to advance the public purpose of maintaining the smelting plant. What is the public purpose North Carolina could be advancing at this point? Well, in the state's recapture request, Your Honor, the state stated that it wanted to use the profits from the Yadkin project to try to fund economic development projects around the state to support the state's community colleges. The state also indicated that there was a need for the state to gain greater control over its water resources as well. And so I think that this is exactly the sort of competition that the FPA intends to foster, where there's a chance to weigh different applications against one another and look at them and compare them to determine which one best serves the public interest. And that's precisely what didn't happen here. So your public interest is simply a generality. If the state owns it, we'll spend the money on good things. Well, and again, there have also been problems with Alcoa's economic – with its environmental management of the dams. The state believes it would be a better environment. Doesn't that all have been raised as it was? If there is a problem with the environmental, that has nothing to do with the representations about the temporary closing, does it? Well, I think in 2002, if the state had considered applying for Alcoa's license – The state had to certify the environmental questions even under this scenario, didn't it? Didn't the state have to issue a certificate? That's correct, Your Honor. Yes. So environmental is off the tape. That's not getting any greater. Well, I think who will serve as a better environmental steward is an issue that's considered in FERC relicensing, and it's not entirely – But in this particular one, the state has already certified on these facts. It issued the certification required of the state on the relic, right? The state did issue a 401 certificate. That's right. And what year was that? I believe it was finally issued in 2015. All right. Thank you. We'll give you some time on rebuttal. Thank you. Mr. Kennedy? Yes, Your Honor. Good morning. Good morning. Robert Kennedy on behalf of the commission. Just to pick up on the last discussion about Alcoa's environmental stewardship, I would also just note that the state of North Carolina's environmental agencies signed off on the settlement agreement that laid out how the project would operate, what sort of environmental remediation would take place going forward. So that, as you said, Judge Santel, that issue has been resolved and is generally off the table. Just getting back to what was discussed, the underlying issue here, the bait-and-switch claim such as it is, I think it's important what fundamentally what North Carolina is claiming is that, hey, we believe this asset can be used differently and for our view of how the power should be distributed should take precedence over Alcoa's because now we know they're using it in ways we don't agree with. And I think the possibility that Alcoa would sell power into the market and use the project power in the manner it thought was best was apparent from the beginning. I mean, as we talked about in this initial consultation document in 2002, Alcoa was forthright and said, and I think it's important, they came out and said our operations have been temporarily curtailed and that we're selling power into the market. And I think there's two things that are important about this document. Everything seems to hinge on the use of the word temporary in that document. And it was issued in September 2002, which is just one month after market conditions caused Alcoa to scale back its operations. So the notion that this was some sort of smokescreen or ruse to chill competition, I think, is undercut by the very chronology. Second, the purpose of this initial consultation document is just to give everyone a heads-up. We're coming up on relicensing. These are the issues that could emerge. So you can start a conversation with the environmental resource agencies and interested parties so that they can identify what studies need to be conducted and the like. Alcoa didn't need to get into how the power was going to be used or anything like that, but they did put that in there. But that's not it. I mean, two years later, March 2004, Alcoa comes in and says, we told you back in 2002 market conditions caused us to stop, curtail operations. Two years later, that's still the case. And I think what they said here is important. They said, the bulk of the power and energy generated at the project is no longer needed for industrial purposes. And in the state's brief, they contend that Alcoa dangled the possibility of the jobs coming back. And I think this document for sure undercuts that. Rather than dangling the possibility of jobs coming back, Alcoa assigned a power purchase contract with the industrial facility to its power marketer and was selling it to the market. That's two years before the deadline for competing applications. How long would it take, just ballpark, for someone else in the market to decide, we want to come in and bid for this license? It's an extensive process. Months? I would say years. A couple years? Yeah, yeah. And so the initial document is four years out from the deadline. The subsequent letter was two years out. And again, as your honors have pointed out, what Alcoa ultimately filed was completely consistent with its public representations. So in terms of the concern about skewing competition and fending off competitors, really the only document that likely matters is the 2002, right? I mean, if you thought that the license application were a little bit overly bullish about the jobs returning, I mean, it's ridiculous to think that five days before the deadline would have had any material impact. Right. But I think it's important that what's in the application, again, underscores that Alcoa was being candid and what it represented in the application is consistent with what it was saying. If we look at the application, it does seem to emphasize a great deal the importance of the project. The Yadkin project is, present tense, critical to Alcoa's primary metals operations. Right. But I think if you keep reading what they say there is, A, the Bayden Works plant had been curtailed and only two to five megawatts were being used. Fair enough. But in terms of overall. It's important to their industrial operations because they can sell that low-cost power and use the proceeds to offset the cost of energy at their other facilities, not that, again, that these specific Bayden Works are coming back. Oh, right, right. Can I ask you about the argument that's made? So in paragraph 68 of the order denying rehearing, JA 932 and 933, the commission said that the issue of how project power will be used is not relevant to the licensing proceeding. Are you, before us, conceding that it is not relevant? Because I can't understand from your brief exactly what your position is here. I think, in retrospect, the phrase, how project power will be used was a little bit imprecise looking back. What Section 15 of the Federal Power Act 808 requires the commission to look at, one of the factors is the need for power. Certainly that is relevant. The applicants need for power, and if they're selling into the market that equates into sort of the region's need for power. The statute is pretty broad, right? It focuses the commission on the public interest. It specifically talks about interests of customers, communities, workers, and so on. Right. It seems a bit much for FERC to just say none of that is relevant. No. Specifically what it says is if the applicant, and this is 15, where are we? It's in D. Right, A to D. It says consider what it directs the commission to do is consider the alternatives to licensing the project. If this applicant comes in and says, I'm using part of my need is based on my industrial operations that I use this project power for, the commission has to look at, okay, well, what if the project goes away? What will be the effect of the alternative source of power on the applicant's industrial operations and the local community? And what the commission incorporates that into its analysis, generally the effect on communities by looking at the difference in price between the power being generated by the proposed project and alternative sources. And that comparison was carried out in the licensing order. What the commission, so need for power is relevant, obviously, under Section 15. What the commission doesn't get into is directing which specific customers should receive project power from the inception, from 1920 until now. Absent congressional direct from Congress, the commission leaves that determination up to the licensee and generally lets market forces determine. But when the commission issued the original license in the 1950s, wasn't it relevant to their granting at that point? Absolutely. That the power was going to be used for this plant? Because in that application process, the ALCOA came in and said we're going to use this power for this project. And in that posture, for the Baden works, and in that posture Section 15 directs the commission to consider that as part of its need analysis, whether there is a need for a project. And also the smelting operations also factored into the length of the license. The idea was that it could be refurbished twice if we give it a 50-year license term. So that's how it factored in. But there was no license requirement that throughout those 50 years, ALCOA give X percentage of the power to the Baden works. FERB certainly treated it as relevant at the time of that authorization. And to reject it is completely irrelevant here. Some might say that's arbitrary and capricious. Why would some be wrong if they said that? Well, because, I mean, because you have to look at what was proposed to the commission in this case. ALCOA came in and said, we're going to be selling the power into the market. Two percent right now is used for the Baden works. That's the only thing that's changed in the ensuing shutdown of the project, that two percent. The commission's analysis proceeded on the basis that ALCOA would be selling power into the market. So the fact that the Baden works subsequently closed didn't affect the commission's analysis in any manner. That's not what they said. They said that how it will be used is not relevant. Which specific customers, I think is what was intended here, is not relevant to the commission's analysis, unless someone comes in, as ALCOA did the first go-around, and said part of my need is for my industrial operations. Then it factors into the analysis. But if the applicant is just going to be satisfying a general need, selling it to the market, then the commission looks at it on that basis, rather than directing that the project power go to any specific entity versus another. Just getting into the second issue, the proposed takeover and transfer, our position is that it is foreclosed by Section 14 of the Federal Power Act, which specifically requires in the takeover context that the federal government take over and thereafter maintain and operate. And that's not what the state's proposing here. So I think the commission was well within its discretion in finding it. Was that reason articulated by the commission? It was. It was in the paragraph 142 of the relicensing order. But not on rehearing. Right. And the issue that has arisen with that is whether that's a Chenery problem, and we submit that it's not. The relicensing order was issued. It's a commission order. It was issued under authority delegated to the Office of Energy Projects. This is not in the brief because it came up on rehearing, but I would just note that Section 375.308 authorizes the director to take action in licensing proceedings, and Section 385.1902 makes that final agency action. Yes, it was not dealt with rehearing, but I don't believe that means the commission can't rely on its initial statement in the licensing order. Because it remains one of the grounds of decision unless it's explicitly abandoned? Yes. I mean, I think the rehearing order essentially, I mean, the purpose obviously is to correct any errors in the initial decision and address any new arguments that are raised. And I think sort of a somewhat analogous case is this Court's, I believe, 2011 decision in Murray Energy v. FERC, where there was a question as to the director's authority, and the Court found that it had been ratified on rehearing. Now, to be clear, there it was explicit ratification because the delegation issue had been raised below. But I think fundamentally that is what's happening in this order and most rehearing orders. The commission corrects whatever errors it sees fit, but otherwise ratifies the licensing order. And I think if you look at the last couple pages of the rehearing order. I mean, that may be true in most orders, but what's striking about this sequence is that the treatment of this issue in the original licensing order, which references the authority question, is pretty perfunctory. And then there's a motion for rehearing, and then on the rehearing order, there's a pretty extensive treatment of this issue, and it doesn't come back and repeat the authority question. Right. Well, with respect to the discussion in the initial order, I think part of its perfunctoriness is the fact that it's pretty clearly, in our view, foreclosed by the language of the statute. On rehearing, there's a list of a number of issues anywhere between 11 and 15 issues raised on rehearing, and the commission focused primarily on those that had not been addressed in detail below. And there had been various variations on the theme. In this statutory construction argument, I think it's a 34-page rehearing order. There is, I believe, one sentence dedicated to the discussion of why it's not foreclosed by the language, and it's what we hear in the brief that, well, it doesn't explicitly say we don't have to pass it along. So I think the commission's treatment of the issue in general on rehearing was appropriate, unless there's any further questions, Your Honor. Thank you. Thank you. All right. Mr. McBride for intervener. Good morning, and may it please the Court. Good morning. There was no bait and switch. There are four documents, only four, that you need to look at to come to that determination. First, JA353, which is a paragraph from the initial consultation document. One month, as counsel for the commission said, after the temporary curtailment, Alcoa forthrightly referred to the temporary curtailment and said during this period energy generated at the project is used by Alcoa to support its other aluminum operations or is sold on the open market. Second, JA366, a voluntary submission from counsel for Alcoa. And, Judge Katsas, I think this goes directly to the question you were asking about how much time somebody would need to prepare a competing application. This letter is profoundly important to this question, because it is simply not true that Alcoa repeatedly said this curtailment was temporary, and Judge Centella did not say that in the application. It said it exactly once. It said it in that initial consultation document at 353. And then in this letter at 366, it harkened back to that representation. It said due to adverse business conditions in the aluminum industry, Alcoa in late 2002 decided to temporarily curtail the production of primary aluminum at the Baden Works. But it went on. Very, very important to say. Although some minimal amount of power, project power, continues to be consumed at the industrial facility, the bulk of the power and energy generated at the project is no longer needed for industrial purposes. In the interim, since the smelter shutdown, they've been selling the power, etc. Given that aluminum market conditions still have not improved sufficiently to permit resumption of aluminum smelting at Baden Works, Alcoa has now decided to assign its purchase contract to another of its affiliates. So things have changed greatly. Now it's a year and a half after that decision. Any reasonable person, Judge Katsas, I think reading this letter, and it's only two pages long, should have said to themselves, oh my God, Baden Works may not be coming back. We'd better get a competing application going. Thirdly, But here we have the benefit of, I guess, hindsight, so to speak, to determine whether there would have been interest in others perhaps. And we see that once the announcement is made, there is interest. There's interest by the state and there's interest by at least one private entity. Why shouldn't we take that into consideration? Well, there may have been interest later, as you say, and I know you're aware of that later interest, Judge Wilkins. But the state said this morning, and it said in its brief at three, that it was resting on its hope that the Baden Works would come back. My point to you is, ALCOA voluntarily informed the Commission and the world, this letter was served on the service list, this plant may not be coming back. And that was in 2004. And competent counsel should know that the deadline was the same for competing applications as it was for ALCOA, April 30, 2006, to get an application prepared. They had more than two years' notice from this letter, Judge Katsas. And then at 381 in the application, they say curtailed. And at page 6 of our brief, we point out that in 2005, in the initial draft of the application which people were provided by ALCOA, the state acknowledges that at page 9, note 4 of its brief. They had a draft of an application if they wanted to work from that, Judge Katsas, in 2005, and the draft didn't say temporary. So never again, other than harking back in 2004 to the 2002 statement, did ALCOA ever say it was temporary. If the Commission had assessed all of these facts and the timeline that you're running through and then the timeline going forward from 2006 and said we don't think equity compels reopening or supports reopening, that would be fine. But arguably, it seems like their assessment of all of this was artificially constricted when on the back end, they just say we're not going to look at downstream use at all because we don't think it's relevant. That had been a Commission determination consistently since 1920 with two exceptions. One is the Power Authority of the State of New York case cited in the briefs in which Congress clearly intended, the Commission found, the FPC found, that there be a regional allocation of the power. The other case was City of Seattle, which we discuss in our brief, which the Commission cited on rehearing, and the Commission in 2013 on relicensing acknowledged that it erred in getting into allocation of the power at the time of initial licensing in Seattle. Put those two exceptions to one side and the Commission has been consistent for almost 100 years that it only looks at need and not allocation of power. That is an unbroken interpretation of the statute, Judge Katz, that I think is powerful here. And consistent with all of the language about considering interest of the community and such. Yes, and I think the Commission explained that this morning. Sure, it can take those things into account, particularly if it's not going to relicense the project. But here, ALCOA was forthright all the way along about what its circumstances were. And by the way, I think what's really important for you to understand, ALCOA didn't say we don't want to pay all this money to do all this environmental cleanup or for some other reason don't want to do this. What ALCOA said was we're a prisoner of the global aluminum marketplace. We can't operate this Baden Works facility profitably because of the market. And everybody ought to know that even as large as ALCOA is, ALCOA doesn't run the global aluminum marketplace. And so the state and anybody else, a potential competitor, Judge Wilkins, should have said, oh, my God, ALCOA is a prisoner here. Let's get some help in understanding the global marketplace, or at least let's just look at the price of aluminum and see if it's coming back. And if it's not, maybe we ought to put two and two together and figure out that these Baden Works probably aren't coming back. And it's not reasonable to just rely on your hope that they'll come back, as the state has said. If there's a reasonable likelihood they're not coming back, any chance, I would argue, then you've got the same deadline everybody else does to get your competing application in. So what's your response to the argument by your friends on the other side  Perhaps it wasn't a big advantage, but there was some advantage that ALCOA had in the licensing, relicensing process because of the presence of the Baden Works project. I don't believe it was a factor because, as the commission has said, by the time the application goes in, only 2% of the power from the project is going to Baden Works. Everybody's aware now by then that 98% is going into the marketplace. In the draft, it was closer to 96% or 97%, but this has been known for years. So the use of power by the Baden Works was really almost inconsequential at best, and the commission has said really it's irrelevant because it's not allocation of power, it's not the use of the power, it's the need for the power. And the commission made a determination that there was a regional need for the power from this project. That was the need predicate. Whereas, by the way, Judge Sentel, 50 or 60 years ago at the time of the initial licensing, although there was discussion of use of the power at the Baden Works, as the commission said in its brief, the commission also noted at that time back in the 50s that it was impossible to figure out what the need for this power would be in the future. You couldn't project that far into the future. So by the time we get to relicensing, the need question, Judge Wilkins, is determined on a regional basis, and there the commission found there was a need for the project. And it really was irrelevant that the Baden Works was using 2% or no percent at that point. There was still a need. That's how the commission analyzes that issue. And could I just make one last point that what the State is really trying to do is fundamentally unfair to my client. Because, as you noted, this purchase price was in the hundreds of millions of dollars. The company has spent tens of millions of dollars since, this is Q, to do all the things that are required under the license. And the State, in its brief at 17.06, refers to Alcoa's net investment of $24 or $91 million. It presents two different figures there. And wants to suggest, apparently, that it should be allowed to have a Federal takeover, hand from the Federal Government to the State, and pay $24 or $91 million for something that we spent hundreds of millions of dollars on in good faith. And under the statute, only the Federal Government gets to pay net investment plus severance damages. 14A makes it absolutely clear that if the State takes the project, it's got to be at just compensation, fair market value. Thank you very much. Thank you. All right. Mr. Doggett, we'll give you two minutes. Thank you, Your Honor. I'd just like to make a few quick points. First, responding to my friend's comment about North Carolina's hope. North Carolina's hope that the jobs would come back to Baden was not a groundless hope. Alcoa specifically stated that the shutdown at Baden would be temporary. And furthermore, there were some references to the 2004 letter that Alcoa submitted. That letter did not state or disavow Alcoa's previous statement that the shutdown would be temporary. To the contrary, it stated that conditions at Baden Works, or conditions in the aluminum market, had not improved enough for smelting to continue, which suggested it would start up again at some point. Alcoa in that letter also reserved the right to rescind its assignment of the contract, again revealing the temporary nature of what had happened. I'd also like to make a quick comment about what Counselor Fork said. Counselor Fork, I believe, acknowledged that in the rehearing order, there was no discussion of the Federal Power Act and whether North Carolina's proposal was within the Federal Power Act, when that was a specific issue that we moved from rehearing on, and there was no response to it at all. So we think we're at least entitled to a chance for FERC, in the first instance, to actually address that issue itself. We would respect the request that the license be vacated, and this case remanded for the licensing to be reopened. And in the alternative, we would request for the case, for the license to be vacated. And this case remanded so FERC can consider on a reasoned basis whether licensing should be reopened and whether North Carolina's recapture proposal should be considered further. Thank you. Thank you. We'll take the case under advisement. Stand, please.
judges: Wilkins, Katsas, Sentelle